IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 126,037

POM OF KANSAS, LLC,
*Plaintiff-Appellant*,

v.

KRIS KOBACH, Kansas Attorney General,
KANSAS RACING AND GAMING COMMISSION, and
SUZANNE VALDEZ, Douglas County District Attorney,
*Defendants-Appellees*,

and

BHCMC, LLC, BOYD GAMING CORPORATION,
and KANSAS ENTERTAINMENT, LLC,
*Intervenors-Appellees*.

SYLLABUS BY THE COURT

1.

K.S.A. 60-1701 empowers courts to declare rights, statuses, and other legal relations whether or not further relief is or could be sought. But declaratory judgment actions, like all suits, must still satisfy Kansas' case-or-controversy requirement.

2.

To establish standing, plaintiffs in Kansas courts must satisfy a two-part test: they must demonstrate a cognizable injury and a causal connection between the injury and the challenged conduct. A cognizable injury need not be current—an impending, probable future harm can suffice. Whether a future harm is impending and probable turns on the case-specific facts.

1

3.

When a district court rules on a defendant's K.S.A. 60-212(b)(1) motion to dismiss for lack of subject-matter jurisdiction before trial based on the pleadings, affidavits, and other written materials without an evidentiary hearing, any factual disputes must be resolved in the plaintiff's favor, and the plaintiff need only make a prima facie showing of jurisdiction. Appellate courts then exercise unlimited review, examining these materials anew rather than deferring to the district court's evaluation.

Appeal from Shawnee District Court; THOMAS G. LUEDKE, judge. Oral argument held October 30, 2024. Opinion filed December 27, 2024. Affirmed in part, vacated in part, and remanded with directions.

*Thomas J. Hamilton*, of Duggan Shadwick Doerr & Kurlbaum LLC, of Overland Park, argued the cause, and *Jay T. Shadwick*, *John M. Duggan*, and *Dustin D. Rucinksi*, of the same firm, were with him on the briefs for appellant.

*Dwight R. Carswell*, deputy solicitor general, argued the cause, and *Kris W. Kobach*, attorney general, was with him on the brief for defendants-appellees.

*Ryan J. Loehr*, of The Edgar Law Firm LLC, of Kansas City, Missouri, argued the cause, and *Matthew R. Watkins*, of the same firm, was with him on the brief for intervenors-appellees.

The opinion of the court was delivered by

WALL, J.:  POM of Kansas owns and distributes Dragon's Ascent, an arcade game that challenges players to shoot dragons for prizes that they can redeem for cash. Concerned their game might be labeled an illegal gambling device, POM sought state agencies' approval before launching in Kansas. When the agencies declined to weigh in, POM moved forward anyway and filed this lawsuit.

The lawsuit seeks a judgment declaring that the Kansas Expanded Lottery Act does not apply to Dragon's Ascent, that the game complies with Kansas' criminal gambling statutes, and that those statutes are unconstitutionally vague. But before reaching these questions, we must consider our constitutional authority to answer them. And that consideration resolves this case.

The Kansas Constitution places limits on judicial power. One such limit requires courts to interpret and apply laws only in actual cases or controversies. To satisfy this case-or-controversy requirement, a party must have legal standing to sue. Because POM has not shown any credible threat of prosecution or injury traceable to the parties they sued, the company lacks standing. We understand POM's desire to confirm that Dragon's Ascent complies with Kansas law. But we cannot expand our judicial power simply because an answer would be helpful. Thus, we dismiss this appeal for lack of jurisdiction.

FACTS AND PROCEDURAL BACKGROUND

POM began its Kansas operations with a prudent first step. Rather than simply launching Dragon's Ascent in Kansas, the company approached the Kansas Racing and Gaming Commission in early 2019 seeking guidance. Specifically, POM wanted to know whether Dragon's Ascent violated Kansas' criminal gambling statutes. Those statutes generally prohibit using, possessing, manufacturing, or distributing a "gambling device." A gambling device is one that enables an operator to receive money or property as the result of chance. See K.S.A. 21-6403 to K.S.A. 21-6408.

The Commission agreed to test the game, but it set strict boundaries. It would offer no formal opinion on the game's legality, and POM could neither treat the review as an endorsement nor use it for marketing purposes.

3

Impatient with the pace of review, POM chose to move forward. POM informed the Racing and Gaming Commission that it would launch Dragon's Ascent, which prompted the Commission to halt its evaluation. POM then began demonstrating the game to various law-enforcement agencies. These efforts complicated matters.

The Racing and Gaming Commission believed POM was using its prior interactions with the Commission to suggest to the law-enforcement agencies that Dragon's Ascent was legal. In response, POM wrote to Kansas district attorneys, sheriffs, and police chiefs to clarify the situation. It stated that the Commission "has not made a determination that the [g]ame is skill-based nor has it determined that the [g]ame is an illegal gambling device."

The Racing and Gaming Commission countered with its own letter to law-enforcement organizations. It said that several Commission staff members had tested Dragon's Ascent and found that it "involved some skill, but contained too many non-skill features, to allow mastery." The Commission also reported that one player had "placed a heavy can on the joy stick, which allowed continuous firing, and beat all of the staff members attempting to win with skill."

Yet the Racing and Gaming Commission's letter did not declare the game illegal. It emphasized that no formal opinion had been provided on whether Dragon's Ascent "was predominantly skill-based or predominantly chance-based." And it suggested that such a determination was "not feasible" because the game's "source code can be easily changed and downloaded to the game machine without anyone being aware." The letter concluded by reminding officers that seizing any suspected gambling device required probable cause—which meant playing the game and "watching for signs that the prize is awarded predominantly as a result of chance."

In a final effort to have Dragon's Ascent deemed a legal game, POM met with then-Attorney General Derek Schmidt and his staff. The discussion revealed that Kansas lacked a formal process to certify games as skill-based rather than chance-based. When an assistant attorney general suggested filing for declaratory judgment, the company apparently took the advice.

One month later, POM filed this action in Douglas County District Court seeking a declaration that Dragon's Ascent did not violate Kansas' criminal gambling statutes. POM argued that its game was purely skill-based—players could learn the dragons' fixed, pre-set patterns.

The case has followed a winding procedural path. Though POM initially sued many government entities, the list eventually narrowed to three defendants:  the Attorney General, the Racing and Gaming Commission, and the Douglas County District Attorney. POM's claims expanded too. What began as a request for a declaration about Dragon's Ascent's legality grew to include constitutional challenges to criminal gambling statutes and questions about whether the Kansas Expanded Lottery Act applied.

Also, three companies that operate casinos in Kansas sought to join the fray. They moved to intervene, arguing that Dragon's Ascent was not only illegal but also causing them financial harm. And they simultaneously filed a separate action against POM in Wyandotte County, claiming Dragon's Ascent tortiously interfered with the casinos' business interests.

The Racing and Gaming Commission and the Douglas County District Attorney moved to dismiss. Through affidavits, they sought to establish that they had neither investigated Dragon's Ascent nor formed any opinion on its legality. And without a credible threat of prosecution, they argued, POM lacked standing to sue them. The

Attorney General charted a slightly different course. While challenging standing on some claims, the Attorney General opted to defend the constitutionality of the criminal gambling statutes on the merits.

The district court addressed the motion to intervene and the motions to dismiss in the same order. It dismissed the Racing and Gaming Commission and Douglas County District Attorney, ruling that no real controversy existed because neither defendant had investigated the game nor threatened prosecution. But the court kept the Attorney General in the case because he had "conceded" that the constitutional challenges raised "'a justiciable controversy.'" Finally, the court granted the casinos' motion to intervene, though only as to POM's constitutional challenges. The district court then transferred the case to Shawnee County.

Once transferred, the Attorney General moved to dismiss POM's Expanded Lottery Act claim under K.S.A 2021 Supp. 60-212(b)(1) for lack of subject-matter jurisdiction. And he sought judgment on the pleadings under K.S.A. 2021 Supp. 60-212(c) on the constitutional claims. The Attorney General also asserted that the Douglas County District Court's previous order had dismissed POM's claim for a declaratory judgment on the legality of Dragon's Ascent.

The court granted the Attorney General's motion. It dismissed POM's Expanded Lottery Act claim for lack of jurisdiction after finding that POM had failed to establish standing. It rejected the constitutional challenges on the merits. And it concluded that the Douglas County District Court had already dismissed POM's request for a declaratory judgment on the legality of Dragon's Ascent for lack of jurisdiction.

POM appealed directly to our court under K.S.A. 2023 Supp. 60-2102(b)(2). That provision allows a party to appeal directly to our court in cases "arising out of any provision of the Kansas expanded lottery act." In the district court, POM had sought a declaration that Dragon's Ascent was not an "electronic gaming device" under K.S.A. 2022 Supp. 74-8702(d), part of the Expanded Lottery Act. Although that claim was dismissed without reaching the merits, it arose from the Act's provisions, and POM continues to contest the dismissal. This connection to the Expanded Lottery Act establishes that our court is the proper forum for this appeal.

We heard oral argument from the parties and intervenors on October 30, 2024.

ANALYSIS

This case turns on standing. POM raises three of its original claims in this appeal: first, that the Kansas Expanded Lottery Act does not apply to its arcade game; second, that its arcade game does not violate Kansas' criminal gambling statutes; and third, that the word "chance" in those gambling statutes renders them unconstitutionally vague. But before reaching the merits of any of these claims, we must consider whether POM has standing to bring them at all. That question is jurisdictional—if the plaintiff lacks standing to bring a claim, Kansas courts lack authority to resolve it, even if all parties seek resolution. See *State ex rel. Morrison v. Sebelius*, 285 Kan. 875, 896-98, 179 P.3d 366 (2008).

We begin by explaining the standing principles that govern this appeal. We then examine the framework guiding a court's analysis of subject-matter jurisdiction at the motion-to-dismiss stage. And finally, applying these principles and frameworks, we analyze POM's legal standing and conclude that the courts lack jurisdiction.

7

I.      *Kansas recognizes both present and "impending, probable" future harm as a cognizable injury when deciding a party's legal standing.*

POM seeks review of three claims raised under Kansas' declaratory-judgment statute. That statute gives courts authority to "declare the rights, status, and other legal relations whether or not further relief is, or could be sought." K.S.A. 60-1701. But this statutory authority does not confer jurisdiction over cases that Kansas courts could not otherwise hear.

The Kansas Constitution, through its implicit separation of powers, limits a court's exercise of judicial power to actual cases or controversies. 285 Kan. at 896. Declaratory-judgment actions, like all suits, must satisfy this case-or-controversy requirement. 285 Kan. at 897-98. Absent "'controversies between rival litigants,'" Kansas courts lack authority to issue advisory opinions in declaratory judgment actions. 285 Kan. at 896-98 (quoting *State, ex rel. Brewster v. Mohler*, 98 Kan. 465, 471, 158 P. 408 [1916]).

The case-or-controversy requirement at issue here is standing. See *Sebelius*, 285 Kan. at 896 (listing four case-or-controversy requirements). To establish standing, plaintiffs in Kansas courts must satisfy a two-part test:  they must demonstrate a "'cognizable injury'" and "'a causal connection between the injury and the challenged conduct.'" *League of Women Voters of Kansas v. Schwab*, 317 Kan. 805, 813, 539 P.3d 1022 (2023). A cognizable injury need not be current—our cases recognize that an "'impending, probable'" future harm can suffice. 317 Kan. at 813 (quoting *Sierra Club v. Moser*, 298 Kan. 22, 33, 310 P.3d 360 [2013]). Whether a future harm is "impending" and "probable" turns on case-specific circumstances rather than any categorical rule.

With these standing principles in mind, we turn to a preliminary question:  what framework guides our review of standing at the motion-to-dismiss stage?

8

II.     *When a district court rules on a defendant's K.S.A. 60-212(b)(1) motion to dismiss for lack of subject-matter jurisdiction before trial based on the pleadings, affidavits, and other written materials, any factual disputes must be resolved in the plaintiff's favor, and the plaintiff need only make a prima facie showing of jurisdiction.*

When moving to dismiss POM's claims under K.S.A. 2023 Supp. 60-212(b)(1), the defendants argued that the district court could look beyond the pleadings to evaluate jurisdiction without converting the motion to dismiss into one for summary judgment. They relied on federal caselaw and *Aeroflex Wichita, Inc. v. Filardo*, 294 Kan. 258, 263-65, 275 P.3d 869 (2012). In *Aeroflex*, the court recognized a district court's broad discretion to examine documents, permit jurisdictional discovery, or hold an evidentiary hearing when ruling on motions to dismiss for lack of personal jurisdiction under K.S.A. 2011 Supp. 60-212(b)(2). The district court followed a Court of Appeals decision that had extended *Aeroflex*'s principles to motions challenging subject-matter jurisdiction under K.S.A. 2017 Supp. 60-212(b)(1). See *Parisi v. Unified Gov't of Wyandotte County*, No. 118,284, 2018 WL 5728439, at *3-5 (Kan. App. 2018) (unpublished opinion). Applying that framework, the court considered both POM's well-pleaded facts and additional materials like affidavits and the Racing and Gaming Commission's letter to law enforcement.

We need not look to the Court of Appeals or federal caselaw. Our court has already extended *Aeroflex* to a court's evaluation of subject-matter jurisdiction at the motion-to-dismiss stage. See *Friends of Bethany Place v. City of Topeka*, 297 Kan. 1112, 1122, 307 P.3d 1255 (2013) (applying *Aeroflex* because "we see no basis for an analytical distinction in how an appellate court should review a district court's order on a motion to dismiss based on standing from one regarding personal jurisdiction").

9

Under this framework, district courts may handle motions to dismiss in several ways. Before trial, a court may rely on pleadings alone, consider affidavits, permit jurisdictional discovery, or hold an evidentiary hearing. *Aeroflex*, 294 Kan. at 263-65. If the court rules on the motion based on the pleadings and written materials without conducting an evidentiary hearing, it must resolve factual disputes in the plaintiff's favor. 294 Kan. at 270. And the plaintiff need only make a prima facie showing of jurisdiction. 294 Kan. at 270. Appellate courts then exercise unlimited review, examining these materials anew rather than deferring to the district court's evaluation. 294 Kan. at 270.

Having established these principles, we can define our task. The district court assessed jurisdiction before trial based on the pleadings and written materials alone, without an evidentiary hearing. So our charge is straightforward: we must examine those same materials, resolving any factual disputes in POM's favor, to determine whether POM has made a prima facie showing of standing. That showing requires either a present injury or an "impending, probable" future harm, plus a causal connection between that harm and the defendants' conduct.

We now examine each of POM's three claims through this lens.

III.    *The courts lack jurisdiction over POM's claims*.

POM argues that the courts have jurisdiction over three claims. The first claim asks the court to declare that the Expanded Lottery Act does not apply to Dragon's Ascent. The second claim asks the court to declare that Dragon's Ascent does not violate Kansas' criminal gambling statutes. The final claim seeks a judgment declaring that those gambling statutes are unconstitutionally vague. Though each claim presents distinct standing issues, none survives scrutiny.

10

A. *POM lacks standing to seek a declaratory judgment about the Kansas Expanded Lottery Act.*

We begin with POM's request for the court to declare that the Expanded Lottery Act does not apply to Dragon's Ascent because the game is not an "electronic gaming machine" under K.S.A. 2023 Supp. 74-8702(d). POM does not allege that the Act currently affects its operations. Instead, it worries that someday these defendants might argue the Act applies. But this concern is purely speculative.

No defendant has suggested the Expanded Lottery Act applies to Dragon's Ascent. In fact, they agree it does not. And the possibility that some third party might take a different view cannot establish standing to sue these defendants. Without any allegation or evidence that defendants intend to apply the Act to Dragon's Ascent, POM cannot show the "impending, probable" future harm our standing doctrine requires. See *Sierra Club*, 298 Kan. at 33 (injury must be "impending" and "probable," rather than speculative and conjectural to confer standing); see also *Baker v. Hayden*, 313 Kan. 667, 681, 490 P.3d 1164 (2021) ("speculative allegations about possible future injury" were insufficient to confer plaintiff with standing).

B. *POM lacks standing to seek a declaratory judgment that Dragon's Ascent is lawful under Kansas criminal gambling statutes.*

We next address POM's request for a declaration that Dragon's Ascent is legal. Kansas criminal gambling statutes generally prohibit using, possessing, manufacturing, or distributing a "gambling device," a device enabling an operator to receive money or property as the result of chance. See K.S.A. 21-6403(e); K.S.A. 21-6404(a)(2); K.S.A. 21-6407; K.S.A. 21-6408. POM seeks a declaration that Dragon's Ascent does not violate these statutes. It argues the game is purely skill-based—players can learn the dragons' fixed, pre-set patterns, making success dependent on skill rather than chance. POM argues that it has alleged both present and future injuries.

11

As to present harm, POM alleges that it has had trouble placing Dragon's Ascent in new establishments due to legal uncertainty. According to POM, this uncertainty stems from the refusal of the Racing and Gaming Commission and Attorney General to opine on the game's legality. POM also alleges that Division of Alcohol Beverage Control agents have told bars not to operate the game without official approval.

These allegations might establish cognizable financial injury, but they fail to show the required causal connection to the challenged conduct—the defendants' acts or omissions. The Division of Alcohol Beverage Control is not a defendant—POM dismissed the Division by stipulation earlier in this litigation. POM cannot establish standing by showing a financial injury traceable to the conduct of a nonparty. See *Gannon v. State*, 298 Kan. 1107, 1130-31, 319 P.3d 1196 (2014) (to satisfy causal-connection requirement, injury must be traceable to defendant's conduct, not the result of action of a third party not before the court). And POM's only theory connecting the Commission and Attorney General to this harm is that they created uncertainty by declining to issue a legal opinion. But as POM acknowledges, these entities have no duty to provide such opinions. Indeed, the absence of any regulatory framework for doing so prompted this declaratory-judgment action. Without such a legal duty, POM cannot establish legal standing to sue these defendants. See *Doe No. 1 v. Secretary of Education*, 479 Mass. 375, 386, 95 N.E.3d 241 (2018) (To show standing, it is not enough to show injury from defendant's act or omission; "the defendant must additionally have violated some duty owed to the plaintiff.").

POM also alleges future injuries: potential prosecution or seizure of its devices. To establish these as cognizable injuries, POM points to two things: the Racing and Gaming Commission's letter to law-enforcement agencies and the defendants' refusal to disavow future prosecution. We have recognized that threatened prosecution can satisfy our standing requirements, but only if that threat is impending and probable. See *League*,

12

317 Kan. at 813 ("[A] plaintiff is not required to 'expose himself to liability before bringing suit to challenge the basis for the threat.'"). So we examine the pleadings, affidavits, and other documents—resolving all factual disputes in POM's favor—to determine whether they show such a threat here.

The Racing and Gaming Commission's letter did note that some staff members thought Dragon's Ascent "involved some skill, but contained too many non-skill features, to allow mastery of the game." And it reported that one player had beaten players trying to use skill simply by placing a heavy can on the joystick. But the letter then emphasized that the Commission had formed no opinion on whether skill or chance predominated. Indeed, the Commission stated it was "not feasible to give" such an opinion because the game's software could be updated at any time.

More telling is what hasn't happened. Dragon's Ascent has operated throughout Kansas for several years without incident. No devices have been seized. No prosecutions have been initiated. No cease-and-desist orders have been issued. And neither the Racing and Gaming Commission nor the Attorney General has opined that the game is illegal. Against this backdrop, we conclude POM cannot make a prima facie showing that prosecution or seizure is impending and probable.

POM argues that this jurisdictional conclusion fails to resolve disputed facts in the company's favor. It focuses on the statements in the letter describing the views of some Commission staff who played the game. The argument is unfounded. Rather than resolving disputed facts, our conclusion simply acknowledges the letter's uncontested content: that the Commission expressed no opinion on the game's legality, notwithstanding remarks made by some staff members who played the game.

POM also emphasizes that the defendants have not explicitly disavowed prosecution and points to federal cases suggesting this silence could create a credible

13

threat. But those cases differ markedly from this one. They involved situations where police had already made arrests (*Seals v. McBee*, 898 F.3d 587, 592 [5th Cir. 2018]), where plaintiffs intended to violate the challenged statutes (*Aptive Environmental, LLC v. Town of Castle Rock*, 959 F.3d 961, 974-76 [10th Cir. 2020]; *Green Party of Tennessee v. Hargett*, 791 F.3d 684, 695-96 [6th Cir. 2015]), or where an agency had issued, then withdrawn, an opinion declaring the conduct illegal (*New Hampshire Lottery Com'n v. Rosen*, 986 F.3d 38, 50-52 [1st Cir. 2021]).

POM's situation is vastly different. Unlike those plaintiffs, POM maintains that its conduct is lawful and seeks only judicial confirmation of that position. Dragon's Ascent operates in Kansas without interference. And neither the Attorney General nor the Racing and Gaming Commission has issued opinions declaring the game illegal. Nor have they taken enforcement action—no seizures, no cease-and-desist letters, no investigations, no prosecutions. Under these circumstances, the defendants' mere failure to disavow future prosecution does not establish an "impending, probable" threat.

C. *POM lacks standing to raise a constitutional vagueness challenge to Kansas criminal gambling statutes.*

POM's final claim asserts that the Kansas criminal gambling statutes are unconstitutionally vague because they fail to provide fair notice of whether a device provides an award "as the result of chance." While the lower courts carefully examined POM's standing to bring its other claims, they gave this one only passing attention. The Douglas County District Court simply noted that the Attorney General had "conceded" the challenge raised "a justiciable controversy." And the Shawnee County District Court then resolved this claim on the merits. The parties' appellate briefs did not address standing, though both maintained at oral argument that jurisdiction exists.

14

But our precedent is clear: parties cannot create subject-matter jurisdiction through concession. See *Friedman v. Kansas State Bd. of Healing Arts*, 287 Kan. 749, 752, 199 P.3d 781 (2009) (jurisdiction cannot be conferred by consent, waiver, or estoppel, including failure to object). And we must examine standing at every stage of litigation. See *Ryser v. Kansas Bd. of Healing Arts*, 295 Kan. 452, 456, 284 P.3d 337 (2012) (reviewing court obligated to examine standing in lower court and on appeal). We do so now.

The two claims we have already addressed seek pre-enforcement review—asking us to consider how statutes might apply to POM before they are enforced. This final claim is also a pre-enforcement challenge, but with a constitutional dimension. Rather than asking about a statute's application, POM questions the statute's very validity. It seeks to strike down as unconstitutional a criminal law that has not yet been enforced against it.

A pre-enforcement constitutional challenge triggers its own standing framework. Like all claims, they must satisfy our traditional requirements: cognizable injury and causal connection. But to determine what qualifies as a cognizable injury, we have recently looked to federal law. See *Hodes & Nauser v. Stanek*, 318 Kan. 995, 1003, 551 P.3d 62 (2024); *League*, 317 Kan. at 813. Under that framework, plaintiffs must establish three elements: (1) they intend to engage in conduct that arguably implicates a constitutional interest, (2) that conduct is arguably prohibited by the challenged statute, and (3) they face a "credible threat of prosecution." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159, 161, 134 S. Ct. 2334, 189 L. Ed. 2d 246 (2014).

We need not look beyond that third element here. Having already established that POM failed to make a prima facie showing that prosecution is impending and probable, we readily conclude there is no "credible threat of prosecution." We note some tension in the Attorney General's position: having argued that POM lacked standing for its previous

15

claim because there was no threat of prosecution, the office nonetheless maintains that there is standing for this claim. When pressed at oral argument, appellate counsel suggested that a statute's sheer ambiguity might itself constitute an injury because one cannot conform conduct to an indecipherable law. But absent concrete present or future harm, even the most perplexing legislative provision cannot create standing. To hold otherwise would render the case-or-controversy requirement meaningless.

In sum, none of POM's three claims meet our standing requirements. Though uncertainty about the legal status of Dragon's Ascent may create practical difficulties for POM, those difficulties do not establish jurisdiction when our state Constitution requires an actual case or controversy. We therefore affirm the order of the district court dismissing POM's claims on the Expanded Lottery Act and the legality of Dragon's Ascent for lack of subject-matter jurisdiction. We also vacate the district court's ruling on whether the criminal gambling statutes are unconstitutionally vague for failing to provide fair notice of whether a device provides an award "as the result of chance," and we remand the matter for the district court to dismiss that claim.

Affirmed in part, vacated in part, and remanded with directions.